HENSEL, BRUCKMANN & LORBACHER, INC. v. UNITED STATES

No. 4728.—Invoices dated Krefeld, Germany, December 8, 1936, etc.
Certified December 16, 1936, etc.
Entered at New York January 4, 1937, etc.
Entry No. 796148, etc.

(Decided on remand (Reap. Dec. 4523) February 13, 1940)

*Puckhafer, Rode & Rode* (*George J. Puckhafer* and *John D. Rode* of counsel) for the plaintiff.

*Webster J. Oliver*, Assistant Attorney General (*Daniel I. Auster* and *Dorothy C. Bennett*, special attorneys), for the defendant.

DALLINGER, Judge: These appeals to reappraisement, listed in schedule "A" hereto annexed and made part hereof, involve the question of the dutiable value of certain chrome steel tubing imported from Germany and entered at the port of New York between November 7, 1935, and March 13, 1937. The following are test cases: reappraisement 117788–A, covering entry 798406; reappraisement 117845–A, covering entry 760770; and reappraisement 117846–A covering entry 815087. The remaining 53 appeals cover duress entries.

The involved merchandise was entered and appraised on the basis of the United States value thereof. After allowing all deductible charges, the appraiser returned the United States value of said merchandise as follows:

Steel tubing, geschalt or turned, $0.0722 per pound
" " not turned .0486 " "
" " not turned .0592 " "
" " not turned .0618 " "
" " with thick walls .1115 " "

At the first hearing, held at New York City on May 18, 1937, the importer claimed that the usual wholesale quantity in which the turned and unturned steel tubing was sold in the principal market in the United States was a carload lot of 40,000 pounds of a particular size, and that the United States selling price, as defined in section 402 (e) of the Tariff Act of 1930, was 8½ cents per pound for the turned or geschalt tubing and 7½ cents per pound for the unturned tubing.

At the time it was not disputed that the United States value was the correct basis of appraisement, and that New York City was the principal market for the sale of said merchandise in this country. Therefore, the only question at issue was the correct United States value of the merchandise.

The case was decided on January 4, 1938, in the case of *Hensel, Bruckmann & Lorbacher, Inc.* v. *United States*, Reap. Dec. 4209, 73 Treas. 1350, Dallinger, Judge, holding that the United States value of said merchandise was 8½ cents per pound for the turned tubing and 7½ cents per pound for the unturned tubing, each less a 6 per centum commission, cost of transportation, insurance, consular fee, and other necessary expenses from Krefeld, Germany, to the dock in New York City, as shown by the invoices, and duty.

On appeal to the Third Division of this court sitting in review, the judgment of the trial court was reversed and the values found by the appraiser were sustained (*United States* v. *Hensel, Bruckmann & Lorbacher, Inc.*, Reap. Dec. 4376, decided August 9, 1938.)

On February 15, 1939, as a result of a rehearing, the Third Division, in *United States* v. *Hensel, Bruckmann & Lorbacher, Inc.*, Reap. Dec. 4523, held that the court below erred, first, in failing to determine the United States value of the merchandise; and second, in admitting in evidence Exhibits 22, 23, 24, and 25 over objection of Government counsel. On those grounds, the decision of the trial court was reversed and the reappraisement appeals were remanded to the trial court for all purposes for a retrial of the issues herein.

In accordance with said remand the reappraisement appeals herein came on for hearing before me on October 20, 1939, at which time counsel for the plaintiff in his opening remark stated that in view of a recent decision of the United States Court of Customs and Patent Appeals in the case of *Stern Hat Co.* v. *United States*, 26 C. C. P. A. 410, C. A. D. 48, decided March 6, 1939, the United States value of the present merchandise could no longer be considered as the proper basis for determining the dutiable value thereof, and that therefore the cost of production must be treated as the proper basis.

At said hearing the plaintiff offered in evidence the testimony of Alexander Benecke, the American representative of the German company which manufactures the kind of steel tubing involved herein, and who had appeared as a witness at the original hearing in this case. This witness testified in part as follows:

R. Q. In selling this steel tubing in this country do you receive orders from your various customers throughout the United States?—A. I do.

R. Q. What do those orders usually specify? How would an order appear?— A. The order specifies the quantity of the tubing, the size. The tubing has to be according to the customer's specifications which I know, which I know to meet specifications as to the hardness, as to the length, as to the tolerance specifications. The specifications are different for all customers, but I know them.

R. Q. What steps do you then take to fill those orders?—A. I send the order to the Deutsche, to the Company who I represent.

R. Q. Does the foreign manufacturer ship the merchandise directly to you in this country, or does he ship to the customers throughout the United States?— A. He ships to me.

R. Q. Do you enter this steel tubing yourself, and pay the duty and other expenses?—A. I do.

R. Q. So that you are the importer of all this merchandise covered by these 56 appeals?—A. I am.

R. Q. What do you do after the merchandise has been entered by you, after it has been entered into this country by you, after you make entry at the customhouse?—A. Ship it to the customer for whom it was ordered, immediately from the pier.

\* \* \*. \* \* \* \*

R. Q. In the usual course of business how long do deliveries usually take from the date you first received your customer's order until the tubing actually arrived at your customer's place of business?

\* \* \* \* \* \* \*

The WITNESS. About five weeks to three months, a little more than two months.

\* \* \* \* \* \* \*

Judge DALLINGER. Why should it take three months?

The WITNESS. They have to make it over on the other side when they get my order, and it takes a long time to make it up, to inspect it, and so forth.

\* \* \* \* \* \* \*

R. Q. Do you maintain any supply of steel tubing in your own stock on hand in this country, yourself?—A. I do not.

R. Q. When a shipment of steel tubing arrives and is entered by you in the customhouse, are you free to dispose of that tubing as you wish or do you consider it already contracted for by the particular customer or customers?—A. I cannot dispose of it as I wish. I must send it to the customer who ordered it and for whom I ordered it.

R. Q. Do you ever deliver steel tubing after its arrival to customers other than those it is intended for?—A. Never.

R. Q. Do you only sell to your customers in the United States on special order for future delivery?

\* \* \* \* \* \* \*

The WITNESS: I do.

\* \* \* \* \* \* \*

R. Q. Has it been your experience that the specifications or requirements of your customers differ?—A. There are practically no two alike. I cannot take a tubing order for one and give it to somebody else, because it would not be according to his specifications as to hardness or other little details.

R. Q. Do you order from the manufacturer, from your manufacturer abroad before receiving orders from your customers here?—A. No, I do not place the order until I have received an order from my customer here in this country.

R. Q. When you receive an order from your customer in this country and you in turn order some merchandise from your manufacturer to fill that order, does your order to your manufacturer contain the specifications called for by your customer's order?—A. My order to the mill contains the customer's specifications. They are not always repeated. It may just say in my order to the mill the American customer's name is given, it is mentioned who gets the tubing, let us say the Ball Bearing Company of America, and it says according to the Ball Bearing Company of America's specifications, which are known at the mill from our previous orders, the specification corresponds. Some of the specifications are always repeated, but not always.

\* \* \* \* \* \* \*

R. Q. For how many years have you followed this method of doing business?—A. Well about thirty years.

R. Q. Has that method been followed by you during the period from November, 1935, to March, 1937?—A. Yes, sir, during that period.

R. Q. Was it followed with or without interruption immediately prior to November, 1935?—A. Yes, sir, at least without interruption since 1921.

\* \* \* \* \* \* \*

Judge DALLINGER. \* \* \*—You testified that you only sold steel tubing or delivered it on orders from certain customers in the United States, and each customer had certain particular specifications which were followed by the manufacturer abroad.

The WITNESS. Yes, sir.

Judge DALLINGER. Now I am asking you if you sold any tubing whatever in the United States other than that?

The WITNESS. No; I did not. Whatever I sold a customer, that was being made up special which I ordered from abroad.

Judge DALLINGER. Did you send out any advertising matter, offering steel tubing of any kind whatever to the trade generally in the United States?

The WITNESS. I never did.

\* \* \* \* \* \* \*

By Mr. RODE:

\* \* \* \* \* \* \*

R. Q. Now was there any such or similar steel tubing previously imported offered for sale packed ready for delivery during that period from November 1935 to March 1937?—A. There was not.

\* \* \* \* \* \* \*

R. Q. Limiting your answer again to this same period, does your manufacturer freely offer for sale for export to countries other than the United States, steel tubing such as or similar to the steel tubing imported by you?

\* \* \* \* \* \* \*

The WITNESS. He does not.

## On recross-examination the witness testified in part as follows:

R. X Q. Have you never had any catalogs or no way of displaying your wares?—A. I never had any catalogs on tubing.

R. X Q. Do you have any catalogs from Germany that you display?—A. None from Germany.

R. X Q. You simply sold by word of mouth?—A. By word of mouth and letter and written confirmation.

R. X Q. Now you stated that each of these 7 customers that you had, had its own particular specifications?—A. Yes.

R. X Q. In what way were the specifications of the American Roller Bearings Co. different from the specifications of what is one of your larger companies?—A. McGill Manufacturing Company, and the Norma-Hoffman Bearings Co. Principally in the following—they differ in the following particulars: First there are slight variations in the analyses.

\* \* \* \* \* \* \*

Judge DALLINGER. Chemical analysis, you mean?

The WITNESS. Yes, Your Honor, and this tubing containing 1.40 percent chromium, but steel tubing contains beside chromium certain other elements.

\* \* \* \* \* \* \*

A. \* \* \* Now there are other elements not mentioned, but there is carbon, one element which also has these variations for each customer, where he has thinness. There is manganese, silicon, there is phosphorous and there is sulphur. That means with chromium there are six elements in the steel and the customer specifies his range for each one of the six elements, and I have yet been unable so far to find two customers who want exactly the same analysis, so I can interchange.

R. X Q. Now does the analysis affect the price?—A. It does not.

R. X Q. Were there any differences beside the analyses you just mentioned?— A. Yes the next would be the size. The size meaning the diameter. Tubing has two sizes, the outside diameter and the inside diameter. \* \* \*. All sizes differ \* \* \*, it practically never happens a certain size one customer has can be used for another.

\* \* \* \* \* \* \*

R. X Q. Did you have any customer in this country during the period involved who purchased just standard steel tubing from you without any particular specifications?—A. No, I did not because there is no standard steel tubing.

\* \* \* \* \* \* \*

R. X Q. You sell all the steel tubing sold in the United States?—A. All the steel tubing of the kind I am selling. \* \* \*.

R. X Q. In what way does yours differ from the other markets of steel tubing?— A. It differs from the way it has been produced and in the way of the size. Mine is the only tubing that has been hot pressed in high, in hydraulic presses, with subsequent drawing on draw benches.

\* \* \* \* \* \* \*

R. X Q. Mr. Benecke, are you connected in any way with the foreign manu-facturer of this merchandise, this tubing?—A. Only that I am his representative here, only in that way.

R. X Q. You are his representative in this country?—A. Sole representative in this country, sales representative.

In addition to the witness' testimony the plaintiff offered three affidavits which were admitted in evidence as Exhibits 26, 27, and 28 respectively.

Exhibit 26 is the affidavit of Willy Temme, the chief of the produc-tion cost and calculating departments of the foreign manufacturer. In said affidavit the affiant states that he was personally familiar with the production costs of the steel tubing delivered by his company to the plaintiff since November 1935, and that said costs in reichsmarks per 100 kilos of the two kinds of finished steel tubing involved herein were as follows:

| | Black or unturned tubing | Turned tubing |
|---|---|---|
| Cost of Material | 12. 00 | 12. 00 |
| Cost of Labor | 9. 80 | 11. 65 |
| General Expenses | 2. 65 | 2. 85 |
| Cost of making merchandise ready for shipment to the United States | 1. 00 | 1. 00 |
| Profit | 2. 45 | 2. 65 |
| Total | 27. 90 | 30. 15 |

In connection with these cost figures, the affiant states that the tubes in question are always shipped without packing; but that the entire cost of making the said tubes ready for shipment amounts to 1 reichsmark per 100 kilos in each case.

Affiant also states that similar merchandise is not produced in Germany by any other manufacturer.

Therefore, the cost per 100 kilos is 27.90 reichsmarks for the black or unturned tubing and 30.15 reichsmarks per 100 kilos for the turned tubing, 100 kilos being equivalent to 220.463 pounds. Hence, the above-mentioned costs, figured in pounds, were for the black or unturned tubing 12.655 reichsmarks per 100 pounds and for the turned tubing 13.675 reichsmarks per 100 pounds.

Exhibit 27 is the affidavit of Walter Gruetzmann, the manager of the tubing works of the foreign manufacturer of the imported tubing at Krefeld, Germany. In this affidavit the affiant, after describing the manufacturing process employed in the production of the imported steel tubing, states as follows:

In the first stages of production all tubing has a thicker wall. By additional working the wall is made thinner. The wall cannot be made thicker. Therefore tubing with thicker wall never costs more to produce than tubing with thinner wall. Tubing with thicker wall does not command a higher price than tubing with thinner wall.

Exhibit 28 is the affidavit of Ernst August Bertram, assistant manager of the shipping department of the foreign manufacturer of the involved tubing. In this exhibit the affiant states that the amounts for freight and insurance from Krefeld, Germany, to New York, appearing on each of the consular invoices herein, are the actual amounts paid therefor.

The Government offered in evidence the report of Charles Kruszewski, Treasury representative, located in Berlin, Germany, dated July 30, 1938, which was admitted in evidence as Exhibit 29.

In this report the Treasury representative states that he was requested to make an investigation relative to the foreign and export values of steel magnets and machine parts manufactured by Deutsche Edelstahlwerke of Krefeld, Germany, and shipped by the said concern to Alexander Benecke at New York; and that in compliance with the Bureau's request he visited the said manufacturer on June 15, 1938, and again on July 17 of the same year. Under the heading of "Export Value" occurs the following statement in said report:

The merchandise under investigation is specially made for the American market. It is manufactured after receipt of order. * * * [Italics mine.]

The author of the said report then states that he was requested to analyze all sales and offers of sale of such or similar merchandise, but that Mr. Schmidt of said concern regretted that his company

could not permit a complete analysis of all sales and offers of sale for the following reasons:

(1) The merchandise sold in Germany and to other countries is dissimilar from that shipped to the United States.

(2) Business transactions in Germany differ radically from those in the United States, making a comparison difficult.

(3) Steel tubings and rods under investigation are not usual commercial articles, but are made according to detailed specifications such as composition, hardness, sizes, etc., prescribed by the individual purchasers. Manufacturer is pledged to keep these specifications secret and therefore is unable to disclose them. * * *

Because of this refusal, counsel for the Government, in her complete and exhaustive brief filed herein, invokes the following provision in section 402 (b) of the Tariff Act of 1930:

* * * an affidavit executed outside of the United States shall not be admitted in evidence if executed by any person who fails to permit a Treasury attaché to inspect his books, papers, records, accounts, documents, or correspondence, pertaining to the value or classification of such merchandise.

and asks the trial court to exclude from consideration the affidavits admitted in evidence as Exhibits 26, 27, and 28.

Inasmuch as this same Treasury representative states in the previous part of his report that the merchandise under investigation was specially made for the American market and manufactured only after receipt of order, and since the evidence offered by the plaintiff not only corroborates such statement, but discloses that all of the imported steel tubing is specially manufactured for the customer in accordance with particular specifications, I am of the opinion that the reasons given by the foreign manufacturer for not disclosing the particular specifications contained in the orders of the American customers forwarded by the plaintiff were in every way justified, and that there is no reason why the evidence in regard to the cost of production contained in such exhibits should not be considered by the court.

While in the latter part of his report the Treasury representative states that some of the steel tubing in question has thick walls, nevertheless he makes the following statement:

* * * The tubings with *thick walls* require more raw materials while the *thin* tubing requires more skilled labor and careful production, hence higher prices.

This latter statement furnishes uncontradicted evidence that the appraiser erred in appraising the thick-walled tubing at a higher price, erroneously based upon the amount of material contained therein.

Upon the entire record I find the following facts:

1. That the merchandise at bar consists of steel tubing exported from Krefeld, Germany, during the period from November 7, 1935, to March 13, 1937.

2. That said tubing is of two kinds, to wit, turned and unturned, the turned tubing being indicated on the invoices by the German word "geschalt," and that the absence of that word indicates that the tubing is not turned, the unturned tubing being also designated as "black" tubing.

3. That some of said tubing has thick walls which cost less to produce than the thin-walled tubing, due to the fact that the latter requires more skilled labor in its manufacture.

4. That such or similar merchandise is not sold or freely offered for sale for home consumption in Germany or for export to countries other than the United States.

5. That all of said merchandise is specially made by the German manufacturer for each of the plaintiff's American customers according to separate and distinct specifications differing from the steel tubing made for any other customer.

6. That the plaintiff is the exclusive agent for the German manufacturer and delivers the steel tubing made for each customer directly to said customer upon arrival of the merchandise in the United States.

7. That the plaintiff keeps in stock for sale or otherwise no tubing of any kind, but simply acts as agent of the German manufacturer in obtaining and forwarding for execution and delivery orders for steel tubing, each order based upon its own particular specifications.

Upon the established facts I hold as matter of law that there is no foreign, export, or United States value of said merchandise, and that the proper basis for determining its dutiable value is its cost of production.

Section 402 (e) of the Tariff Act of 1930 reads:

UNITED STATES VALUE.—The United States value of imported merchandise shall be the price at which such or similar imported merchandise is freely offered for sale, packed ready for delivery, in the principal market of the United States to all purchasers, at the time of exportation of the imported merchandise, in the usual wholesale quantities and in the ordinary course of trade, with allowance made for duty, cost of transportation and insurance, and other necessary expenses from the place of shipment to the place of delivery, a commission not exceeding 6 per centum, if any has been paid or contracted to be paid on goods secured otherwise than by purchase, or profits not to exceed 8 per centum and a reasonable allowance for general expenses, not to exceed 8 per centum on purchased goods.

It will be noted that among the various statutory requirements of said section there are two which are especially pertinent to the instant merchandise. The first of such requirements is that such or similar *imported* merchandise must be freely offered for sale to all purchasers, and that this necessarily assumes that such or similar imported merchandise must have been freely offered for sale to all purchasers previous to the shipment of the merchandise in question.

In the case of *United States* v. *G. W. Sheldon & Co.*, 23 C. C. P. A. 245, T. D. 48108, the United States Court of Customs and Patent Appeals in affirming a decision of this court said:

The conclusion of the division as to the method of ascertainment of United States value must be the correct one, under the language of section 402 (e) of said tariff act. The said value is the price at which such or similar imported merchandise is *freely offered for sale*, packed, in the principal market of the United States, to all purchasers, *at the time of exportation* of the merchandise which is being valued. This could, of course, be established only by such or similar goods which had been previously imported and were being freely offered for sale at the time of export of the goods being valued.

In the more recent case of *Stern Hat Co.* v. *United States*, 26 C. C. P. A. 410, C. A. D. 48, the same tribunal quoted with approval its above expressed views in the *Sheldon* case, *supra.*

In the case of *Stern Hat Co.* v. *United States*, *supra*, as in the instant case, it appeared that the importer did not carry in stock the merchandise there involved (hats), but sold the same only upon special orders for future delivery, each order containing the particular specification governing the hats desired by each customer. In reversing the finding of United States value by the trial court, the appellate court said:

It is only the sale of merchandise imported previous to the dates of exportation of the merchandise being appraised that can be resorted to as a basis for arriving at the United States value of such merchandise.

In the instant case there is no evidence that at the time of exportation such or similar previously imported steel tubing was freely offered for sale to all purchasers in the United States.

The second requirement of the statute is that such or similar imported merchandise must have been freely offered for sale *packed ready for delivery* to all purchasers in the United States. According to the evidence the plaintiff is the sole agent for the German manufacturer and has never maintained a stock of steel tubing on hand, but only takes orders for special kinds of steel tubing for delivery 2 or 3 months in the future. It is manifest that this requirement of the statute was not complied with in the instant case, and therefore the appraiser erred in finding United States value.

In the case of *Kuttroff, Pickhardt & Co.* v. *United States*, Reap. Dec. 17, the Third Division of this court, sitting in review and construing the meaning of United States value, said:

* * * The United States value means the value in a market that functions It means a place at which property actually sells, and there is nothing in the language of the statute to suggest such elasticity as would take the credit price for speculative deliveries in the indefinite future, as the United States value of merchandise yet to be ordered and imported from abroad.

* * * The evidence shows that there was not on hand any stock at all. * * * There was no ability to sell, deliver packed and cash the sales in the regular course of trade, because the sellers or proposed sellers were only able to take orders and risk importing the merchandise from abroad and then delivering it in the future.

Upon the entire record I find the dutiable value of the steel tubing constituting the imported merchandise at bar to be its cost of production as follows:

| | Black or Unturned Tubing. Reichsmarks per 100 kilos | Turned Tubing. Reichsmarks per 100 kilos |
|---|---|---|
| Cost of material | 12. — | 12. — |
| Cost of labor | 9. 80 | 11. 65 |
| General expenses | 2. 65 | 2. 85 |
| Cost of making merchandise ready for shipment to the United States | 1. — | 1. — |
| Profit | 2. 45 | 2. 65 |
| Total | 27. 90 | 30. 15 |

Judgment will be rendered accordingly.